**Richard PHIPPS, Plaintiff,**

v.

**NEW YORK STATE DEPARTMENT OF LABOR, Defendant.**

No. 97–CV–0937.

United States District Court, N.D. New York.

June 24, 1999.

O'Connell and Aronowitz, Albany, NY, Gloria Herron Arthur, James Shannon, of counsel, for Plaintiff.

Attorney General for the State of New York, Albany, NY, Senta B. Siuda, Asst. Atty.Gen., of counsel, for Defendant.

## MEMORANDUM–DECISION & ORDER

McAVOY, Chief Judge.

Plaintiff Richard Phipps brings the instant action against defendant New York State Department of Labor ("DOL"), alleging race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and N.Y. HUMAN RIGHTS LAW § 290 *et seq. Plaintiff also alleges state law claims of negligent supervision/training, prima facie tort and intentional infliction of emotional distress. Plaintiff seeks declaratory and injunctive relief, monetary damages, and attorneys' fees.*

Presently before the Court is defendant's motion for summary judgment pursuant to FED. R. CIV. P. 56 seeking dismissal of the Complaint in its entirety.

## I. Background

Because this is a motion for summary judgment by the defendant, the following facts are presented in the light most favorable to plaintiff. *See Ertman v. United States,* 165 F.3d 204, 206 (2d Cir.1999).

Plaintiff, an African–American male, was hired by DOL in 1980 as an Employment and Training Grants Management Specialist III ("ETGMS III") in the Special Grants Management Unit ("SGMU"). In that capacity, plaintiff was responsible for implementing and monitoring DOL's employment and training programs and administering state funding for various community-based work and youth programs.

In 1992, plaintiff was voluntarily transferred to the DOL's Internal Security Department ("ISD"). Although he retained his title as an ETGMS III, plaintiff's new duties included investigating fraud within the DOL's Unemployment Insurance Division. Plaintiff was teamed up with another investigator, and reported to Ina Lawson ("Lawson") and Alan Greene ("Greene"), his Field Supervisors; Carolyn Walker ("Walker"), ISD Unit Chief; and Charles Kilb ("Kilb"), Director of Audit and Control for the DOL. In April 1993, plaintiff requested a transfer back to the SGMU. After Director Kilb initially denied that request, the DOL Personnel Office approved the transfer in June 1993. Director Kilb, however, refused to act upon plaintiff's approved transfer.[1] On May 28, 1993, plaintiff filed a formal grievance concerning defendant's inaction in effectuating his transfer request back to SGMU. *See* Pl.Ex. 9.

Shortly after plaintiff filed his transfer request, Richard Vitkay ("Vitkay"), an ISD investigator, informed plaintiff of a "racial

---

**1.** Kilb's disagreement over plaintiff's transfer back to SGMU was based, in part, on plaintiff "becom[ing] a productive member of [ISD]" and, therefore, plaintiff's reassignment was "unjustified and by no means in the best interests of [ISD]." Pl.Ex. 8.

slur" allegedly made by Greene concerning plaintiff. Specifically, Vitkay alleges that, in referring to plaintiff, Greene stated: "he was going to get that lazy nigger." *See* Pl.Ex. 10; Vitkay Aff. at ¶¶ 5, 7, 10, 13. Vitkay subsequently reported his conversation with Greene, as well as perceived "racial problems" that he believed existed in the ISD Unit, to defendant's Division of Equal Opportunity Development ("DEOD") office. *See* Pl.Ex. 10. Greene's alleged racial slur also became the focus of the grievance meeting held on June 9, 1993. *See* Phipps Aff. at ¶ 42–45. Present at that meeting were plaintiff; Joseph Lattanzio ("Lattanzio"), a Labor Relations Representative from the DOL's Office of Employee Relations; and Karen Watson, a representative from DOL management. Plaintiff alleges that Lattanzio violated DOL procedure by failing to refer his grievance to DEOD. Instead, Lattanzio prepared a written "Step II Decision" holding, inter alia, that plaintiff had been "duly transferred" to ISD and, therefore, was not permitted to transfer back to SGMU.[2] *See* Pl.Ex. 13. Following an appeal of that decision, plaintiff was reassigned to SGMU in September 1993.[3] *See* Pl.Ex. 20.

During the pendency of plaintiff's appeal of Lattanzio's decision, plaintiff was involuntarily redeployed to the "Out of State Residents" Unit, a unit within the Unemployment Insurance Division. *See* Phipps Aff. at 87. Plaintiff argues that this redeployment was racially motivated, and in retaliation for reporting both the alleged racial slur made by Greene and defendant's failure to adequately address his complaint. *See id.* at ¶¶ 75–90. In response to his redeployment, plaintiff filed a second grievance on August 26, 1993, see Pl.Ex. 17, and a formal complaint with DEOD alleging racial discrimination and harassment.[4] *See* Pl.Ex. 10. Specifically, plaintiff contends that there were sufficient volunteers within ISD to fill the redeployment positions and plaintiff's ETGMS III job classification made him unsuitable for redeployment.[5] *See* Phipps Aff. at ¶¶ 76, 78. Furthermore, plaintiff contends that he was the only employee at the ETGMS III level to be *involuntarily* redeployed by defendant. *See id.* at ¶ 86. In his new position, plaintiff claims that his duties were menial and clerical in nature, and included, inter alia, opening and sorting the mail. *See id.* at ¶ 87. Plaintiff further claims that his new job duties were not comparable to the duties he performed in his previous positions, and he soon became the source of "ridicule and derision" by his peers and supervisors. *See id.* at ¶¶ 88–89. Unlike white employees who were permitted to return to their original work duties, plaintiff alleges that he performed clerical tasks in his redeployed position for one month, until he was reassigned back to SGMU in September 1993

---

**2.** In arguing that defendant's actions were racially motivated, plaintiff places significant emphasis on Lattanzio's re-characterization of Greene's alleged racial slur concerning plaintiff as "verbal abuse" rather than as a "racial slur." Phipps Aff. at 47–49. Defendant, however, argues that plaintiff's grievance concerned his reassignment to SGMU rather than allegations of racial discrimination and, therefore, Green's alleged statements were not central to plaintiff's May 28, 1993 grievance. *See* Pl.Ex. 11 (Lattanzio Dep. at 51).

**3.** Plaintiff argues that defendant's intentional failure to address Greene's alleged racial slur in its decision reassigning plaintiff to SGMU permitted racial discrimination and retaliation to continue within ISD.

**4.** In the complaint filed with DEOD, plaintiff made reference to his involuntary redeployment to the Out of State Residents Unit and the racial slur allegedly made by Greene. *See* Pl.Ex. 10.

**5.** In assessing suitability for redeployment, Kilb stated that those employees "who were not working on critical assignment areas ... [were] considered the best candidates to be transferred." Kilb Dep. at 118–19. Earlier, however, Kilb described plaintiff as "a fully productive member" of ISD whose reassignment was "unjustified and by no means in the best interest of [ISD]." Pl.Ex. 8.

following a favorable outcome on his earlier appeal. *See id.* at ¶ 90.

Shortly after returning to SGMU in September 1993, plaintiff alleges that he was subjected to continued discrimination and was retaliated against for filing a complaint with DEOD. Specifically, plaintiff alleges that he was: (1) not given any work assignments for a period of eight months; (2) assigned a desk located next to the photocopier machine and was "engulfed by the copier's exhaust fumes and deafened by the noise whenever it was operated"; (3) denied use of a telephone for seven months, and only obtained access to a telephone by purchasing a device that permitted him to connect to a co-worker's existing telephone line; (4) denied access to a computer necessary to complete his assignments; (5) the only person in SGMU to handle youth contracts, a high-stress assignment typically spread out among the other account executives; and (6) the only person assigned to work in high risk/high crime areas in New York City. *See id.* at ¶¶ 173–94.

On December 15, 1993, DEOD issued its formal report regarding the allegations raised in plaintiff's September 17, 1993 racial discrimination complaint.[6] *See* Pl. Ex. 30. Although the report found no evidence to support the charge of racial discrimination or retaliation, the report noted that:

> There is no question that Mr. Phipps' perception that he has been victimized is credible. Mr. Phipps[,] through some subtle bureaucratic stratagems[,] may have been unfairly treated, which has

caused harm to him and may affect his career.[7]

*See id.*

The federal Complaint also alleges racial discrimination and retaliation in connection with defendant's failure to reimburse plaintiff for work-related travel expenses incurred during August 1996. Specifically, defendant denied reimbursement on plaintiff's travel voucher and issued plaintiff a Notice of Interrogation based on allegations that plaintiff improperly included travel time in calculating his workday hours.[8] *See* Phipps Aff. at ¶¶ 195–204; Pl. Ex. 34. In arguing that he was unfairly investigated and wrongly denied reimbursement on his travel voucher, plaintiff alleges that his actions were consistent with instructions received from his previous supervisors, and there was no written policy disallowing an employee to include travel time as part of his workday hours. *See* Phipps Aff. at ¶¶ 211, 213, 217–18; *see also* Pl.Ex. 34. Significantly, plaintiff contends that he was:

> the only person in my grade and title subjected to an Inspector General's investigation for including travel time as part of my ... workday and for leaving a training session early after those segments relating to my programs had concluded.

Phipps Aff. at ¶ 222.

Although the Inspector General's Office recommended plaintiff be reimbursed for his travel expenses, it also recommended that plaintiff "be counseled for leaving the training sessions before they were completed." Pl.Ex. 34. Plaintiff filed a third grievance with DEOD in late 1996 regard-

---

6. The DEOD report addressed plaintiff's allegations regarding (1) Greene's alleged racial slur, (2) plaintiff's involuntary redeployment and (3) management's delay in responding to plaintiff's complaints in a timely manner. *See* Pl.Ex. 30.

7. The DEOD report recommended, inter alia, that (1) the procedures for processing complaints of racial discrimination be revised; (2) ISD be given sensitivity training immediately; and (3) no retaliation be taken against plain-

tiff as a result of his filing a complaint. *See* Pl.Ex. 30.

8. The Notice of Interrogation was part of an investigation conducted by the Inspector General after Lattanzio, a party to plaintiff's previous complaints of racial discrimination and retaliation, reported concerns regarding plaintiff's travel vouchers and attendance records. *See* Pl.Ex. 34; Phipps Aff. at ¶¶ 207, 224–27.

ing defendant's investigation of plaintiff's travel expenses. *See* Pl.Ex. 55.

Plaintiff also alleges that his work regarding youth contracts limited the quality of training and tasks he received and, therefore, foreclosed plaintiff from promotional opportunities enjoyed by his co-workers. *See* Phipps Aff. at ¶¶ 234–40. Following relocation to another building, plaintiff alleges that he was physically segregated from his co-workers, and once again placed near a photocopy machine. *See id.* at ¶¶ 244–48. Citing his relocation as the "final straw that broke my back and resolve," plaintiff sought early retirement, which reduced the size of his retirement package. *Id.* at 249–51.

On January 14, 1994, plaintiff filed a charge of discrimination with the New York State Division of Human Rights ("NYSDHR"). *See* Pl.Ex. 62; Def. 7.1(a)(3) Stmt. at Ex. A. In that charge, plaintiff alleged, in relevant part:

> On or about June 9, 1993, I reported an alleged racial slur on the part of a supervisor in Internal Security. On or about August 26, 1993, I was involuntarily redeployed to perform clerical duties in the Unemployment Insurance, Out of State Residents Office.

> On or about September 7, 1993, I requested to be sent back to my official position. I requested this of Joe Baez, Director of Grants management. On September 10, 1993, Mr. Baez denied my request saying that I was assigned elsewhere. On information and belief, Ed Drago, who is white, was allowed to go back to his original position after being redeployed.

Plaintiff received a Right–To–Sue Letter on April 8, 1997, and timely filed his federal Complaint on July 3, 1997. Defendant now moves to dismiss plaintiff's Complaint in its entirety pursuant to Fed. R. Civ. P. 56.

## II. Discussion

### A. Treatment of the Parties' 7.1(a)(3) Statements

Defendant submitted a 7.1(a)(3) Statement consisting of 11 numbered paragraphs. *See* N.D.N.Y.L.R. 7.1(a)(3). In opposition, plaintiff submitted a 7.1(a)(3) Statement consisting of 129 paragraphs, which detailed many of the allegations set forth in plaintiff's federal Complaint. Thereafter, defendant filed a Responsive 7.1(a)(3) Statement, admitting and denying the facts set forth in plaintiff's opposing 7.1(a)(3) Statement. Plaintiff then filed a "supplemental" 7.1(a)(3) Statement, addressing the 11 facts set forth in defendant's original 7.1(a)(3) Statement.[9]

Rule 7.1(a)(3) of the Local Rules for the Northern District of New York provides, in relevant part:

> The opposing party shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall *mirror* the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions *in matching numbered paragraphs.* Each denial shall set forth a specific citation to the record where the factual issue arises (emphasis added). The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. *Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

N.D.N.Y.L.R. 7.1(a)(3).

Because plaintiff's 129 paragraph response did not mirror the 7.1(a)(3) Statement submitted by the defendant, the facts set forth in defendant's 7.1(a)(3) Statement are deemed admitted. *See Osier v. Broome County,* 1999 WL 304683, at *3 (N.D.N.Y. May 11, 1999); *Riley v. Town of Bethlehem,* 5 F.Supp.2d 92, 93 (N.D.N.Y.

---

**9.** Plaintiff's supplemental 7.1(a)(3) Statement was numbered from 130 through 140, indicating that plaintiff intended it to be considered in addition to the 129 paragraph opposing 7.1(a)(3) Statement initially submitted by plaintiff.

1998) ("Rule 7.1(f) is not a suggestion, nor is it a rule of general guidance upon which attorneys are free to impose their own interpretations of what must be submitted."). Moreover, the parties' "responsive" and "supplemental" 7.1(a)(3) Statements, not provided for under the Local Rules, will not be considered by the Court in addressing defendant's motion for summary judgment.[10]

## B. The Standard for Summary Judgment

The standard for summary judgment is well-settled. Under FED. R. CIV. P. 56(c), if there is "no genuine issue as to any material fact . . . the moving party is entitled to a judgment as a matter of law . . . where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 86 (1996). The moving party bears the initial burden of "informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting FED. R. CIV. P. 56(c)). The initial burden is to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548.

Once the moving party has met its burden, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548; *Matsushita*, 475 U.S. at 585–86, 106 S.Ct. 1348. A dispute regarding a material fact is genuine if a reasonable jury could return a verdict for the non-moving party; that

is, whether the non-movant's case, if proved at trial, would be sufficient to survive a motion for judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When reasonable minds, however, could not differ as to the import of the evidence, then summary judgment is proper. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

Although the trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought, *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989); *Eastway Const. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985) *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), the motion will not be defeated by a non-movant who raises merely a "metaphysical doubt" concerning the facts or who only offers conjecture or surmise. *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990), *cert. denied*, 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991) (quoting *Matsushita*, 475 U.S. at 586), 106 S.Ct. 1348; *see also Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990). Indeed, the non-moving party's opposition may not rest on mere allegations or denials of the moving party's pleading, but "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).

Although the Court is mindful that "summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated," *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985), it is clear that "conclusory allegations of discrimination are insufficient to satisfy the requirements of Rule 56(e)." *Id.* (citations omitted); *see also*

---

**10.** While plaintiff was granted permission to file a surreply, that permission contemplated

a memorandum of law, not a surreply 7.1(a)(3) Statement.

*Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997).

### C. Plaintiff's State Law Claims

Defendant argues that the Eleventh Amendment renders this Court without subject matter jurisdiction to hear plaintiff's statutory claims under N.Y. HUMAN RIGHTS LAW § 290 *et seq.* ("HRL"), and the common law claims for intentional infliction of emotional distress, prima facie tort and negligent supervision/training. *See* Def. Mem. of Law at 1–5.

The Eleventh Amendment bars suits against states by their own citizens in federal court in the absence of waiver by the state or abrogation by Congress. *See Welch v. Texas Dept. of Highways and Public Transp.,* 483 U.S. 468, 472, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987); *Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). State waiver will be found "only where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" *Pazamickas v. New York State Office of Mental Retardation and Dev. Disabilities,* 963 F.Supp. 190, 196 (N.D.N.Y.1997). (quoting *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)).

Nothing in the HRL provides any basis for finding that New York State has waived its Eleventh Amendment immunity. *See Kilcullen v. New York State Dep't of Transp.,* 33 F.Supp.2d 133, 137 (N.D.N.Y. 1999) (citing *Mete v. New York State Office of Mental Retardation and Developmental Disabilities,* 984 F.Supp. 125, 134 (N.D.N.Y.1997), *aff'd,* 162 F.3d 770 (2d Cir. 1998)); *Pazamickas,* 963 F.Supp. at 196 (citing *Jungels v. State University College of New York,* 922 F.Supp. 779, 784 (W.D.N.Y.1996), *aff'd,* 112 F.3d 504, 1997 WL 219065 (2nd Cir.1997); *Moche v. City Univ. of New York,* 781 F.Supp. 160, 167–69 (E.D.N.Y.1992), *aff'd,* 999 F.2d 538 (2d Cir.1993); *Cassells v. University Hosp. at Stony Brook,* 740 F.Supp. 143, 147–48 (E.D.N.Y.1990)). Thus, plaintiff's HRL claims against defendant, a state agency, are barred by the Eleventh Amendment, as are plaintiff's common-law claims. *See Pazamickas,* 963 F.Supp. at 196; *Jungels,* 922 F.Supp. at 784 (citing *Mascheroni v. Board of Regents of the Univ. of California,* 28 F.3d 1554, 1557–60 (10th Cir. 1994)); *see also Fonseca v. Columbia Gas Sys., Inc.,* 37 F.Supp.2d 214, 230 (W.D.N.Y.1998); *Percesepe v. New York State Dep't of Labor,* 1996 WL 1057165, at *2 (E.D.N.Y. Dec.12, 1996), *aff'd,* 125 F.3d 844 (2d Cir.1997), *cert. denied,* —— U.S. ——, 119 S.Ct. 877, 142 L.Ed.2d 777 (1999).

### D. Exhaustion of Administrative Remedies—Reasonably Related Claims

Defendant next argues that the cause of action sounding in retaliation is not included in, nor reasonably related to, plaintiff's administrative complaint filed with the NYSDHR, and is, therefore, barred due to plaintiff's failure to exhaust his administrative remedies.

"A district court only has jurisdiction to hear Title VII claims that either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is 'reasonably related' to that alleged in the EEOC charge." *Butts v. New York Dep't of Housing, Preservation & Dev.,* 990 F.2d 1397, 1401 (2d Cir.1993) (citations omitted). The purpose of the exhaustion requirement is to "encourage settlement of discrimination disputes through conciliation and voluntary compliance." *Id.* The filing requirement provides notice to the party charged with a violation and gives that party an opportunity to comply with Title VII before the commencement of a lawsuit and to participate in conciliation. *See Davis v. Weidner,* 596 F.2d 726, 729 (7th Cir.1979); *McNight v. Dormitory Auth. of the State of New York,* 995 F.Supp. 70, 76 (N.D.N.Y.1998).

A complaint "must be sufficiently precise to identify the aggrieved individual and the agency and to describe generally the action(s) or practice(s) that form the basis of the complaint." *See* 29 C.F.R. § 1614.106(c). In this case, plaintiff filed his SDHR Complaint on January 13, 1994, claiming, inter alia, that he reported an alleged racial slur made by his supervisor, and shortly thereafter, was involuntarily redeployed to a position involving clerical tasks. *See* NYSDHR Complaint, at ¶¶ 1–3. Moreover, plaintiff contends that while his white co-workers were permitted to return to their original positions following redeployment, plaintiff was not permitted to do so. *See id.* at ¶ 4.

 The Court finds that plaintiff's administrative charge reasonably alleges both racial discrimination and retaliation. First, plaintiff's reporting of Greene's alleged racial slur constitutes a protected activity. *See Wimmer v. Suffolk County Police Dept.,* 176 F.3d 125, 134 (2d Cir. 1999); *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir.1998); *Gallagher v. Delaney,* 139 F.3d 338, 349 (2d Cir. 1998); *Del Castillo v. Pathmark Stores, Inc.,* 941 F.Supp. 437, 438–39 (S.D.N.Y. 1996). Second, plaintiff's NYSDHR complaint reasonably alleges retaliation based on plaintiff's charge that defendant involuntarily redeployed him shortly after reporting Greene's alleged racial slur. A careful reading of the administrative charge reflects allegations sufficient to place defendant on notice regarding claims of racial discrimination and retaliation. The Court further notes that the additional specific incidents of workplace discrimination and retaliation contained in plaintiff's federal Complaint, which occurred before and after plaintiff filed his SDHR charge, are similar and reasonably related to those charges, and would therefore fall within the scope of the NYSDHR's investigation under the first and third *Butts* exceptions. *See Butts,* 990 F.2d at 1402; *McNight,* 995 F.Supp. at 77; *Dargento v. Bally's Holiday Fitness Ctrs.,* 990 F.Supp. 186, 193

(W.D.N.Y.1997). Significantly, defendant acknowledges that all of plaintiff's retaliation claims grow out of the same incident—plaintiff's reporting of alleged acts of racial discrimination to defendant. *See* Def. Mem. of Law at 10.

### E. Plaintiff's Race Discrimination Claim

Under the familiar burden-shifting paradigm set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 803, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a plaintiff claiming discrimination must first satisfy the *de minimis* burden of establishing, by a preponderance of the evidence, a prima facie case of discrimination. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Fisher v. Vassar College,* 114 F.3d 1332, 1335, 1340 & n. 7 (2d Cir.1997) (en banc), *cert. denied,* —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). To establish such a case, a plaintiff must show four elements: (1) membership in a protected group; (2) qualification for the position; (3) adverse employment action; and (4) circumstances giving rise to a reasonable inference of race discrimination. *See Hicks,* 509 U.S. at 506, 113 S.Ct. 2742; *see also Austin v. Ford Models, Inc.,* 149 F.3d 148, 152 (2d Cir.1998); *Fisher,* 114 F.3d at 1335.

If a plaintiff succeeds in establishing a prima facie case, the burden of production shifts to the employer to articulate a clear and specific legitimate, nondiscriminatory reason for its conduct. *See Fisher,* 114 F.3d at 1335–36. Although the burden of production shifts to the defendant, the ultimate burden of persuasion remains always with the plaintiff. *See id.* at 1335 (citing *Hicks,* 509 U.S. at 507, 113 S.Ct. 2742); *see also Raskin v. The Wyatt Co.,* 125 F.3d 55, 64 (2d Cir.1997).

If the employer satisfies this burden, "the presumption raised by the prima facie case is rebutted, and drops from the case." *Hicks,* 509 U.S. at 510, 113 S.Ct. 2742. (internal quotations and citations omitted).

"The plaintiff then has the opportunity to demonstrate 'that the proffered reason was not the true reason for the employment decision,' and that race was." *Fisher*, 114 F.3d at 1336 (quoting *Hicks*, 509 U.S. at 507–08, 113 S.Ct. 2742). The plaintiff's opportunity to show the employer's proffered reason was false now merges with his ultimate burden to persuade the trier of fact that he has been the victim of discrimination. *See Hicks*, 509 U.S. at 508, 113 S.Ct. 2742; *Fisher*, 114 F.3d at 1337; *see also Hollander v. American Cyanamid Co.*, 172 F.3d 192, 199 (2d Cir. 1999); *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir.1995) ("[T]he plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors.")

Applying the *McDonnell Douglas* paradigm to the present case, the Court finds that plaintiff has made the "minimal" showing necessary to establish a prima facie case of racial discrimination.

Defendant does not contest that plaintiff belongs to a class of protected persons and that he was qualified for the position in which he worked; thus, the first and second elements of plaintiff's prima facie case are satisfied. *See, e.g., Morris v. Northrop Grumman Corp.*, 37 F.Supp.2d 556, 572 (E.D.N.Y.1999). With respect to the third prong, plaintiff alleges, inter alia, that defendant made a racially derogatory remark about him; failed to act on his approved transfer back to SGMU; subjected him to inadequate and unequal working conditions over an extended period of time, which included inadequate access to a telephone and computer, and assignment to "high risk" areas in New York City; and involuntarily redeployed him to a position of significantly less prestige and responsibility. Plaintiff claims that defendant's actions were racially motivated and directed solely at him and that his white co-workers were not subjected to similar actions and

working conditions. In response, defendant argues that plaintiff's allegations do not constitute adverse employment action or give rise to an inference of discrimination sufficient to satisfy the third and fourth prongs of a prima facie case of discrimination.

Defendant's arguments, however, fail to recognize that adverse employment action is "not limited to 'instances of discrimination in pecuniary emoluments' ", *de la Cruz v. New York City Human Resources Admin. Dept. of Soc. Services*, 82 F.3d 16, 21 (2d Cir.1996) (quoting *Rodriguez v. Board of Educ.*, 620 F.2d 362, 366 (2d Cir.1980)), and may include instances where plaintiff was transferred to a less prestigious unit with little opportunity for advancement or where the employer's actions negatively affected the terms or conditions of plaintiff's employment. *See Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 444 (2d Cir.1999) ("[T]he transfer and reassignment—which involved different job responsibilities and a move to a position involving contact with the prisoner population—constituted an adverse employment decision."); *Gallagher*, 139 F.3d at 349 (transfer to position with less prestige and customer contact sufficient to find a material adverse change); *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir.1997) ("We recognize that, as in retaliation cases brought under Title VII, the ADEA does not define adverse employment action solely in terms of job termination or reduced wages and benefits, and that less flagrant reprisals by employers may indeed be adverse."); *de la Cruz*, 82 F.3d at 21 (citing *Day v. Derwinski*, 771 F.Supp. 588, 592 (S.D.N.Y.) ("If an employee's transfer to a different job is motivated by race or age considerations, it is obviously a discriminatory action affecting terms or conditions of employment."), *aff'd*, 953 F.2d 635 (2d Cir.1991)); *Collins v. Illinois*, 830 F.2d 692, 702–04 (7th Cir. 1987) (lateral transfer involving equal pay and benefits with change in responsibilities

constitutes adverse employment action). Here, while plaintiff's pecuniary benefits may have remained the same after his transfer, under the standard enunciated in *de la Cruz,* the Court finds that plaintiff's workplace conditions and transfer from a position of significant responsibility to a position consisting mainly of menial, clerical tasks, sufficient to satisfy the third element of his prima facie case. *See Greenway v. The Buffalo Hilton Hotel,* 143 F.3d 47, 53 (2d Cir.1998) ("Courts—not juries—should determine whether the initial *McDonnell Douglas* burdens of production have been met."). Moreover, viewing the totality of plaintiff's allegations of racial discrimination, the Court finds that they occurred under circumstances giving rise to an inference of discrimination. *See Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 314 (2d Cir.1997) (noting that the jury "will be entitled to view the evidence as a whole in assessing whether there was impermissible discrimination and whether [defendant's] proffered explanation is a pretext for that discrimination.") (citing *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)); *see also Schwapp,* 118 F.3d at 110; *Fierro,* 13 F.Supp.2d at 488. Accordingly, the Court finds that plaintiff has met his *de minimis* burden of establishing a prima facie case of racial discrimination.

At this point, a presumption of unlawful discrimination exists which:

> places upon the defendant the burden of producing an explanation to rebut the prima facie case—i.e., the burden of "producing evidence" that the adverse employment actions were taken for a legitimate, nondiscriminatory reason. The defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action.

*Hicks,* 509 U.S. at 506, 113 S.Ct. 2742 (quotations omitted); *see also Trustees of Columbia Univ.,* 131 F.3d at 312.

The explanations proffered by the employer must be "clear and specific," *Gallo,* 22 F.3d at 1226 (quoting *Meiri,* 759 F.2d at 997); *Ryduchowski v. The Port Auth. of New York and New Jersey,* 1998 WL 812633, at *8 (E.D.N.Y. Nov.19, 1998) (noting that shifting the burden to the employer "forces the defendant to 'give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent.'") (quoting *Fisher,* 114 F.3d at 1337), and must address "*each of the adverse employment actions of which plaintiff complains.*" *Ryduchowski,* 1998 WL 812633, at *8 (emphasis added); *see also Riedinger v. D'Amicantino,* 974 F.Supp. 322, 329 (S.D.N.Y.1997).

▪ Plaintiff's prima facie case is predicated on specific alleged acts of discrimination: (1) Greene's alleged racially derogatory comment referring to plaintiff as a "lazy nigger"; (2) Kilb's refusal to act on plaintiff's request to transfer back to SGMU; (3) plaintiff's involuntary redeployment to the Out of State Residents Unit where his job responsibilities were reduced and he performed clerical tasks; (4) defendant not assigning plaintiff and not providing him with access to a telephone and computer; (5) defendant providing plaintiff a work station located near a copy machine; (6) defendant's delays in acting on plaintiff's reports of racial discrimination and retaliation; (7) defendant only assigning plaintiff to field work in "high crime" areas in New York City; and (8) defendant's investigation into plaintiff's time reports, and delays in approving plaintiff's travel vouchers. Evidently relying on its earlier arguments that the majority of plaintiff's allegations should be dismissed because plaintiff failed to exhaust his administrative remedies, and that those allegations are also insufficient to establish a prima facie case of discrimi-

562

nation, defendant proffers a legitimate, nondiscriminatory reason to only one of plaintiff's allegations. Specifically, defendant contends that plaintiff was involuntarily redeployed because he was not working on critical assignments at that time. *See* Def. Mem. of Law at 15. Defendant's reason, however, does not encompass the host of other specific incidents of discrimination that are part of plaintiff's prima facie claim. Because defendant has not offered "clear and specific" legitimate, nondiscriminatory reasons with respect to plaintiff's other allegations of racial discrimination, *see Gallo,* 22 F.3d at 1226, the Court finds that defendant has not satisfied its burden of production sufficient to trigger the third prong of *McDonnell Douglas. See, e.g., Hicks,* 509 U.S. at 510, 113 S.Ct. 2742 ("The defendant then knows that its failure to introduce evidence of a nondiscriminatory reason will cause judgment to go against it unless the plaintiff's prima facie case is held to be inadequate in law or fails to convince the factfinder."); *Richardson,* 180 F.3d at 444–45; *Frazier v. Rominger,* 27 F.3d 828, 831 (2d Cir.1994). Accordingly, defendant's motion for summary judgment with respect to plaintiff's racial discrimination claim is denied.

#### F. Plaintiff's Retaliation Claim

Defendant next moves for summary judgment dismissing plaintiff's claim of retaliation.

■ Retaliation claims pursuant to 42 U.S.C. § 2000e–3 are also subject to the familiar *McDonnell Douglas* burden-shifting analysis described above. *See Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 46 (2d Cir.1980). "To establish a prima facie case of retaliation, an employee must show '[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action.'" *Wimmer,* 176 F.3d 125, 134 (quoting *Quinn,* 159 F.3d 759, 769 (2d Cir.

1998)). Courts have held that the plaintiff's burden at this stage is slight, and "[a plaintiff] may establish a prima facie case with de minimis evidence." *Wanamaker,* 108 F.3d at 465 (analyzing retaliation claim under the ADEA) (citing *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988)); *see also Donato v. Plainview–Old Bethpage Cent. Sch. Dist.,* 96 F.3d 623, 633 (2d Cir.1996), *cert. denied,* 519 U.S. 1150, 117 S.Ct. 1083, 137 L.Ed.2d 218 (1997).

■ "To establish the first of these elements—participation in a protected activity—plaintiff need not prove that the conditions against which he protested actually amounted to a violation of Title VII." *Wimmer,* 176 F.3d 125, 134; *see also Davis v. State University of New York,* 802 F.2d 638, 642 (2d Cir.1986). Rather, plaintiff must demonstrate "only that he had a 'good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'" *Wimmer,* 176 F.3d 125, 134 (quoting *Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988)). Plaintiff's reporting of Greene's alleged racial slur constitutes protected activity. *See Sumner v. United States Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990) ("In addition to protecting the filing of formal charges of discrimination, [Title VII] protects as well informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges."); *Stordeur v. Computer Assocs. Int'l, Inc.,* 995 F.Supp. 94, 105 (S.D.N.Y. 1998); *Barcher v. New York Univ. Sch. of Law,* 993 F.Supp. 177, 184 (S.D.N.Y.1998) ("A 'protected activity' includes the registering of a complaint of a Title VII violation, which 'need not take the form of a formal claim filed with a court or administrative agency ... [but] may simply be an objection voiced to the employer.'") (quot-

ing *Iannone v. Frederic R. Harris, Inc.,* 941 F.Supp. 403, 410 (S.D.N.Y.1996)), *aff'd,* 172 F.3d 37 (1999); *Del Castillo,* 941 F.Supp. at 438–39.

To establish adverse employment action, plaintiff alleges much of the same incidents that supported his discrimination claim. These include, inter alia, (1) involuntary redeployment to the Out of State Residents Unit; (2) field work assignments to "high crime" areas in New York City; (3) Kilb's refusal to act on plaintiff's transfer back to SGMU; (4) not being provided adequate resources to complete his job responsibilities; (5) defendant's investigation of plaintiff's time reports and denial of his travel vouchers; and (6) defendant's delays in acting upon plaintiff's employment grievances in a timely manner. As previously discussed, these incidents constitute adverse employment action sufficient to establish the second prong of a prima facie case of retaliation. *See* discussion *supra,* at 560–61; *Gallagher,* 139 F.3d at 349; *Wanamaker,* 108 F.3d at 466; *de la Cruz,* 82 F.3d at 21.

Plaintiff also satisfies the causal connection prong for a prima facie case of retaliation. Plaintiff reported Greene's alleged racially derogatory remark as early as June 1993, in a formal written grievance filed with defendant. The remark was also the subject of discussion between the parties at subsequent meetings and hearings. Defendant's alleged retaliatory acts occurred as early as August 1993. The additional acts of alleged retaliation occurred throughout early 1994 (after plaintiff filed his NYSDHR complaint), and recommenced in 1996. The temporal relationship between the protected activity and the adverse employment action is sufficient to find a causal connection between plaintiff engaging in protected activity and the resulting adverse employment action. *See Richardson,* 180 F.3d 426, 440 ("[B]ecause the transfer and reassignment were the first actions [defendant] took after [plaintiff] returned from the leave on which she filed her EEOC charge, there

was sufficient evidence that the transfer and reassignment were causally related to [plaintiff's] engagement in protected activity."); *Quinn,* 159 F.3d at 769; *Taitt v. Chemical Bank,* 849 F.2d 775, 777 (2d Cir.1988) ("Proof of causal connection can be established indirectly by showing that the protected activity was followed closely by discriminatory treatment...."). Having concluded that plaintiff has established a prima facie case of retaliation, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for taking adverse employment action. *See Hollander,* 172 F.3d at 199.

Relying solely on its arguments that plaintiff failed to establish a prima facie case of retaliation, defendant does not proffer *any* reason for its actions. Accordingly, defendants have not met their burden of production under the *McDonnell Douglas* scheme with respect to these incidents and, thus, its motion for summary judgment with respect to plaintiff's retaliation claim is denied. *See Richardson,* 180 F.3d 426, 445–46.

## III. CONCLUSION:

For all of the foregoing reasons, defendant's motion for summary judgment is granted in part, and denied in part. Defendant's motion for summary judgment is GRANTED with respect to plaintiff's state law claims, and DENIED with respect to plaintiff's federal law claims for racial discrimination and retaliation.

**IT IS SO ORDERED.**